UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | CASE NO. 1:16-cr-00259-TWP-MJD |
| | ) | |
| WILLIE FERRELL, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION FOR ORDER OF COMPASSIONATE RELEASE REDUCING SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

The Defendant, Willie Ferrell ("Willie"), by his counsel, Mario Garcia, respectfully moves

this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) based

on the "extraordinary and compelling" reasons presented by the COVID-19 pandemic. Willie

requests an order reducing his sentence to time served. Willie has under six years remaining until

his scheduled release date.[1] His period of incarceration will be followed by five years of supervised

release. Willie is at a significant risk of contracting and developing life-threatening complications

from an exposure to COVID-19 because he suffers from asplenia and hypertension, is pre-diabetic,

and has suffered from a collapsed lung in the past.[2] The COVID-19 pandemic has created

extraordinary and compelling reasons for his immediate release.  The Defendant could be placed

on home confinement as part of his terms of supervised release to allow him to safely reside at

home.

---

[1] *See* Willie's release date at *https://www.bop.gov/inmateloc/*.
[2] Asplenia is a result of a splenectomy—Willie's spleen was removed in 2005 as a result of being
shot multiple times. *See* Exhibit A.

1

## STATEMENT OF FACTS

Willie was born on February 25, 1977. He is currently 43 years old. Willie has an extensive medical history. He has had his spleen removed in the past, he is pre-diabetic, he suffers from hypertension, and has had a collapsed lung. These are serious, chronic illnesses for which there is no definitive cure.

On March 15, 2019, Willie pled guilty to one count of Possession with Intent to Distribute and to Distribute five (5) kilograms or more of Cocaine.[3] He was sentenced to 130 months of imprisonment, followed by five years of supervised release.[4] Willie has been incarcerated at FCI Milan and is set to be released in April 2026. If or when Willie is released, he will be residing with his wife, Jasmine Ferrell, at 12111 Misty Way in Indianapolis, Indiana 46236. He will be employed by James Penn, the owner of a printing company in Indianapolis, Indiana, where his job will consist of processing new orders.[5] Willie would also have full medical and life insurance through his wife's job, where she has been employed for 17 years. Additionally, Willie would like to finish his college education at Fortis College with the goal of obtaining his degree and subsequently begin providing maintenance services on HVAC systems.[6]

## LEGAL STANDARD

In December 2018, the President signed the First Step Act into law. P.L. 115-391. The Act was a momentous "culmination of a bi-partisan effort to improve criminal justice outcomes, as well as to reduce the size of the federal prison population while also creating mechanisms to maintain public safety." Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1

---

[3] *See* Dkt. 182 at 1.
[4] Dkt. 182.
[5] *See* Exhibit B.
[6] *Id.*

(2019). The statute amends numerous portions of the U.S. Code "to promote rehabilitation of prisoners and unwind decades of mass incarceration." *United States v. Brown*, 411 F.Supp.3d 446,448 (S.D. Iowa 2019).

Compassionate release, codified in its amended form at 18 U.S.C. § 3582(c), provides the means for inmates with "extraordinary and compelling" circumstances to be released from prison early whenever "extraordinary and compelling reasons warrant such a reduction." § 3582(c)(1)(A)(i). 18 U.S.C. § 3582(c) provides in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission....

18 U.S.C. § 3582(c)(1)(A).

Congress has not defined "extraordinary and compelling circumstances" under 18 U.S.C. § 3582(c)(1)(A)(i), but rather directed the U.S. Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t).

In interpreting the meaning of "extraordinary and compelling reasons," some courts have turned to the United States Sentencing Commission's policy statement for the BOP on compassionate release, adopted before the passage of the First Step Act. U.S.S.G. § 1B1.13 and its accompanying Application Notes. Although § 1B1.13 predates the First Step Act, a majority of

courts have concluded that § 1B1.13 provides helpful, if not dispositive guidance, for understanding the breadth of discretionary authority afforded courts in these cases. *See, e.g., United States v. Schmitt*, 2020 WL 96904, at *3 (N.D. Iowa, Jan. 8, 2020); *see, e.g., United States v. Rodriguez*, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019); *United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Brown*, 411 F.Supp.3d 446, 451 (S.D. Iowa 2019); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). U.S.S.G. § 1B1.13 states that compassionate release requires "extraordinary and compelling reasons;" consideration of the factors set forth in § 3553(a); and that the petitioner "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13.

The Application Notes in § 1B1.13 provide four categories under which extraordinary and compelling circumstances might exist. Those categories are: (A) Medical Condition of the Defendant; (B) Age of the Defendant; (C) Family Circumstances; and (D) Other Reasons. The first three of categories outline specific criteria that would need to be met, while the fourth, "Other Reasons," provides an open-ended catch-all, allowing a court to use its discretion to assess whether "there exists in the defendant's case an extraordinary and compelling reason other than . . . the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, cmt. n.1. This provision supports courts' conclusions that those charged with evaluating a compassionate release petition have broad discretion to do so.

Additionally, it is well-known that Congress's intent in conceiving this new law was to address the issues and failures of compassionate release under previous statutes, namely that only the BOP was previously empowered to seek compassionate release relief, and it rarely did so.

*United States v. Cantu*, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) (citing *United States v. Gutierrez*, 2019 WL 1472320, at *1 (D.N.M. Apr. 3, 2019). Until 2013, an average of only twenty-four inmates were released each year through the BOP program. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (cited by *United States v. Brown*, 411 F.Supp.3d 446, 451 (S.D. Iowa 2019). After complaints to the BOP from the Inspector General's office, the number of inmates released rose to eighty-three. *Id.* Still insufficient, Congress deemed it prudent to amend the statute, as the available remedy was not achieving the desired results. Thus, the purpose of the compassionate release provisions in the First Step Act is to increase the number of approved compassionate release petitions by allowing defendants to file motions in district courts themselves. *United States v. Brown*, 2019 WL 4942051, at *3 (S.D. Iowa Oct. 8, 2019).

Notably, during the years before the passage of the First Step Act, the BOP had broad discretionary powers in determining what "extraordinary and compelling circumstances" meant. *See Crowe v. United States*, 430 F. App'x 484, 485 (6th Cir. 2011) (The statute itself "does [not] define—or place any limits on—what 'extraordinary and compelling reasons' might warrant such a reduction.") For this reason and those stated above, the "most natural reading" of the amended compassionate release statute is that "the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it." *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019).

Thus, district courts have wide discretionary authority when considering compassionate release petitions, and the meaning of "extraordinary and compelling" is left for the court to determine based on the particular and unique cases before it. One district court has defined

"extraordinary" as "beyond what is usual, customary, regular, or common," and has defined a "compelling reason" as one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *United States v. Cantu*, 2019 WL 2498923, at *5 (S.D. Tex. 2019) (quotations omitted). Accordingly, courts across the country have embraced broad discretionary authority under this statute to consider diverse and unique cases. The standard for compassionate release remains high, but potentially qualifying circumstances are broad and encompassing.

In the year since the First Step Act took effect, courts have significantly expanded the scope of compassionate release, finding "extraordinary and compelling reasons" in circumstances wholly apart from, or in combination with, the limited factors on which the BOP narrowly relied (age, medical condition, and family needs):

- *United States v. Owens*, No. 97-CR-2546-CAB, ECF No. 93 at 4 (S.D. Cal. Mar. 20, 2020) ("In the wake of the First Step Act, numerous courts have recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence — and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual § 1B1.13 n.1(D), that is, 'an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)' relating to prisoner health or family relations." (citation and internal quotation marks omitted));

- *United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) . . . .");

- *United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *2 (D. Kansas Mar. 11, 2020) ("Since the passage of the First Step Act, however, a majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it. . . . The United States agrees that this is the majority view. . . . As a majority of district courts have concluded, this court concludes that it has the authority to exercise the same discretion as the BOP when weighing a request for compassionate relief." (internal citations and quotations marks omitted));

- *United States v. Young*, No. 2:00-cr-0002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("Notwithstanding the statutory amendment, . . . the 'catch-all' provision

in Application Note (1)(D) to U.S.S.G. § 1B1.13 still cross-references the BOP Director as the individual with authority to determine in a particular prisoner's case the existence of another 'extraordinary and compelling reason, other than, or in combination with, the reasons described in subdivisions (A) through (C).' . . . As both parties recognize, however, the dependence on the BOP to determine the existence of an extraordinary and compelling reason . . . is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act.  Although it does not appear that any federal circuit court of appeals has addressed this issue, a majority of the district courts that have considered the issue have likewise held, based on the First Step Act, that they have the authority to reduce a prisoner's sentence upon the court's independent finding of extraordinary or compelling reasons.");

- *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kansas Feb. 21, 2020) (agreeing with "numerous courts" that have "recognized the court can determine whether extraordinary and compelling reasons exist to modify a sentence — and may do so under the 'catch all' provision similar to that recognized in U.S.S.G. Manual § 1B1.13 n.1(D), that is, 'an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)' relating to prisoner health or family relations");

- *United States v. Maumau*, No. 2:08-cr-0758-TC, 2020 WL 806121, at *3 (D. Utah Feb. 18, 2020) ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement." (citation and internal quotation marks omitted));

- *United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8. 2020) ("agree[ing] with those courts" that have concluded that "Guideline § 1B1.13 cmt. n.1 does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant");

- *United States v. Valdez*, No. 3:98-cr-0133-01-HRH, 2019 WL 7373023, at *2 (D. Alaska Dec. 31, 2019) ("This court concludes that it is no longer bound to look to the director of the Bureau of Prisons for a definition of extraordinary and compelling reasons beyond application note 1(A) through (C)");

- *United States v. Rodriguez*, No. 17-cr-00021-WHO-1, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019) ("This court follows the growing number of district courts that have concluded that, in the absence of applicable policy statements, courts 'can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. 1B1.13 cmt. N.1 (A)-(C) warrant compassionate release.'");

- *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) ("[T]his Court may use Application Note 1(D) as a basis for finding extraordinary and compelling reasons to reduce a sentence.");

- *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752, at *2 (N.D. Ohio Oct. 17, 2019) ("However, under subsection (D) of the note, the Court may also consider other 'extraordinary and compelling reasons' not specifically articulated.");

- *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019) ("[I]f the FSA is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.");

- *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6, 8-9 (M.D.N.C. June 28, 2019) ("[C]ourts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement.");

- *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Application Note 1 (D), as currently written, provides that such combination of circumstances will be '[a]s determined by the Director of the Bureau of Prisons.' However, the current policy statement predates the enactment of the First Step Act and is not likely to be amended within the foreseeable future due to lack of a sufficient number of serving members of the Sentencing Commission. Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect." (internal citation omitted));

- *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) ("[T]he correct interpretation of § 3582(c)(1)(A)—based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statements 'at any time'—is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief." (internal citation omitted)).

As these cases illustrate, now that courts are no longer constrained by the BOP's narrow interpretation of "extraordinary and compelling reasons," they have embraced their broad discretion under § 3582(c)(1)(A) to grant compassionate release.

## ANALYSIS

**A. The COVID-19 Pandemic, Which Poses Particular Dangers to Medically Vulnerable Inmates, presents "Extraordinary and Compelling Reasons" that Justify Compassionate Release.**

On March 11, 2020, the World Health Organization ("WHO") officially classified the spread of COVID-19, the disease caused by the novel coronavirus, as a pandemic.[7] On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 et seq.[8] Several days later, the White House issued guidance recommending that gatherings of ten or more persons be canceled or postponed.[9]

In the weeks since these pronouncements, COVID-19 has continued to spread at an alarming rate. As of April 8, 2020, more than 1.4 million people have been infected globally and nearly 88,000 people have died. In the United States, more than 420,700 people are reported to have been infected and more than 14,000 people have died.[10] (The numbers, which increase sharply every day, almost certainly underrepresent the true scope of the crisis in the U.S. considering the widespread unavailability of test kits to detect the virus.) To stem the spread of the disease, the CDC has broadly advised people to take basic preventive actions, such as avoiding crowds, staying six feet away from others, keeping surfaces disinfected, and frequently washing their hands or using hand sanitizer.[11]

---

[7] "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at *https://bit.ly/2W8dwpS*.

[8] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), available at *https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/*.

[9] Sheri Fink, "White House Takes New Line After Dire Report on Death Toll," *New York Times* (March 17, 2020), available at *https://www.nytimes.com/2020/ 03/17/us/coronavirus-fatality-rate-white-house.html?action=click&module= Spotlight&pgtype=Homepage*.

[10] "COVID-19 Coronavirus Pandemic," available at *https://www.world-ometers.info/coronavirus/*. Updated daily, last viewed April 8, 2020.

[11] *Id.*

At the same time, public health experts have warned that incarcerated individuals "are at special risk of infection" and are "less able to participate in proactive measures to keep themselves safe."[12] Indeed, the conditions in BOP facilities provide a uniquely hospitable environment for COVID-19 to spread.[13] Prior to March 13, 2020, when the BOP suspended visits for 30 days, inmates regularly engaged in social, legal and medical visits with people in the community at a time when the novel coronavirus already began to spread.[14] To this day, inmates must share communal living spaces, such as cells, recreation rooms, dining halls, libraries, and exercise yards. To make matters worse, hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission, is deemed forbidden "contraband" in BOP facilities because of its alcohol content.[15]

The current situation at FCI Milan, where Willie is placed, is equally as dangerous. As of date, there have been a total of 73 confirmed COVID-19 cases for inmates at FCI Milan.[16] Additionally, 56 staff members have also tested positive. Three inmates have already perished. When compared to the rest of the BOP facilities, FCI Milan is much less affected by this deadly

---

[12] "Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at *https://bit.ly/2W9V6oS*.

[13] Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8): 1047-1055 (2007), available at *https://doi.org/10.1086/521910*; Vice, "Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits" (Mar. 24, 2020), available at *https://www.vice.com/ en_us/ article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits*.

[14] "Federal Bureau of Prisons Covid-19 Action Plan," available at *https://www.bop.gov/resources/news/20200313_covid-19.jsp*.

[15] Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?," *ABA Journal* (March 13, 2020), available at *https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus*.

[16] *See* Statistics of COVID-19 Cases in BOP at https://www.bop.gov/coronavirus/. Last visited May 29, 2020.

virus. However, the COVID-19 pandemic has come to be characterized by substantial increases of confirmed cases within very short time spans. For example, at FMC Lexington, the number of confirmed COVID-19 cases jumped from under 10 to over 200 in just three weeks. While it is not a certainty that this would happen at FCI Milan, there is a higher possibility of this happening due to the number of already infected people within the facility. Especially since many facilities are still having tremendous difficulties in being able to mitigate the dangers of COVID-19 or its infection rate amongst their populations. Given Mr. Ferrell's current physical health, this is not a chance that he can afford to take because contracting COVID-19 could be a fatal blow to him.

This Court noted in *U.S.A. v. Damon Powell,* 1:16-cr-00152-JMS-MJD (Dkt., #57) that the Government's argument that the FMC Lexington was an appropriate place for Mr. Powell to receive medical treatment was undercut by the fact that Mr. Powell was infected with the virus *while in the BOP's custody*, despite the fact it has had a Pandemic Influenza Plan in place since 2012. *Id. at 11,* (citing Dkt. 54 at p. 4). The Court specifically found that the BOP's response to COVID-19 in Lexington "*is neither successful nor effective*" when considering the risk presented to Mr. Powell.  *Id.*  That is also very likely the case with regard to the risk posed to Willie should he contract the virus in a facility that already can't be considered a safe environment for someone with a compromised immune system from hypertension, pre-diabetes and asplenia.

Recognizing the unique risks that correctional facilities pose to both inmates and employees, members of Congress asked the BOP on March 19, 2020, to allow for the immediate release of elderly, non-violent inmates.[17] The following week, Attorney General Barr urged the

---

[17] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons

Director of the BOP to prioritize home confinement for such vulnerable individuals.[18] On March 27, 2020, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly and medically vulnerable inmates who have already served a majority of their sentence.[19] The same day, dozens of leading public health experts made a similar request, asking the President to commute the sentences of all elderly inmates, noting that these individuals are at the highest risk of dying from the disease and pose the smallest risks to public safety.[20] Further, Dr. Chris Beyrer, leading epidemiologist from Johns Hopkins University, has stated under oath that, regarding COVID-19, "the case fatality rate is higher in men, and varies significantly with advancing age, rising above 5%, for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise."[21] Mr. Ferrell certainly falls within this class of especially endangered persons due to his well-documented medical conditions relating to respiratory, cardiovascular, and other similar health issues. Mr. Ferrell's asplenia is of significant concern in this case. As mentioned above, Willie underwent a

---

may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

[18] Office of the Attorney General to the Director of Bureau of Prisons, "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic," March 26, 2020, available at *https://www.themarshallproject.org/documents/6820452-Memorandum-from-Attorney-General-to-BOP-re-Home*.

[19] *https://fairandjustprosecution.org/wp-content/uploads/2020/03/Letter-to-Trump-from-DOJ-and-Judges-FINAL.pdf*.

[20] *https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf*.

[21] Chris Beyrer, *Declaration for Persons in Detention and Detention Staff COVID-19*, Center for Public Health and Human Rights at Johns Hopkins University, available at https://www.aclu-md.org/sites/default/files/field_documents/ex_d_-_beyrer_declaration_final.pdf (last visited May 1, 2020).

splenectomy in 2005 and "Splenectomy renders all patients vulnerable to mainly bacterial infections. If infected by the [COVID-19] virus patients may also develop secondary bacterial infections. This may then trigger serious and life-threatening sepsis."[22] This means that Mr. Ferrell is especially susceptible to developing life-threatening complications should he contract COVID-19.

Despite the BOP's efforts to take precautionary measures, they are woefully unprepared to contain the virus's spread. The number of staff and inmates within the BOP who have tested positive for COVID-19 has nearly doubled every few days over the past week. In fact, there are so many presumptive cases of the disease at the federal correctional institution in Oakdale, Louisiana (where two inmates with underlying medical conditions already have died) that the facility is no longer conducting tests.[23] In the alarming crisis that is unfolding, the universally-recommended antidote is simple: reduce the prison population. The BOP's ability, or lack thereof, to contain the spread of this highly transmissive disease is further detailed by the increase of total BOP cases from just two on March 20, 2020, to 3,086 on May 13, 2020.[24]

---

[22] *See* Informational Leaflet, *The COVID-19 Pandemic and Haemoglobin Disorders*, Thalassaemia International Federation (May 15, 2020), https://www.thalassemia.org/boduw/wp-content/uploads/2020/03/The-COVID-19-Pandemic-and-Haemoglobin-Disorders.pdf.

[23] *See* Nicholas Chrastil, "Louisiana federal prison no longer testing symptomatic inmates for coronavirus due to 'sustained transmission,'" The Lens (Mar. 21, 2020), *https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/*; BOP Press Release, "Inmate Death at FCI Oakdale I" (Mar. 28, 2020), *https://www.bop.gov/resources/news/pdfs/20200328_press_release_oak_death.pdf*; BOP Press Release, "Inmate Death at FCI Oakdale I" (Apr. 1, 2020), *https://www.bop.gov/resources/news/pdfs/20200401_press_release_oak_death_a.pdf*.

[24] Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (April 7, 2020) at https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at

Courts are increasingly heeding the call from legal and medical experts by releasing old and vulnerable inmates from overcrowded facilities. In *United States v. Collins*, Crim. No. 10-CCB-0336, ECF 1038 (Mar. 30, 2020), a federal district court recently reduced the defendant's sentence to time served and ordered his immediate release, stating:

> Finally, the court must acknowledge the extraordinary circumstances present in the community as a result of the COVID-19 pandemic. It is well established by public health authorities that efforts should be made to permit social distancing and minimize the risks of transmission through close contact. While it has not been proffered that Collins has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release when weighed against all the factors the court must consider, here we have, as described above, a non-violent drug offender who has already served a lengthy sentence and has been determined ready for community placement at the VOA. Collins has a home ready to receive him, where he can be placed on home confinement. While traditional location monitoring (an ankle bracelet) is not currently available, other methods of monitoring may be implemented in the discretion of the Probation Office.

Numerous courts are in accord. *See*, *e.g.*, *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpub.) (sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v. Grobman*, No. 18-cr-20989, ECF 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted of fraud in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Kennedy*, No. 5:18-cr-20315, ECF 77 (E.D. Mich. Mar. 27, 2020) (releasing defendant after plea, despite prior revocation of release, because "COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is *necessary* for Defendant to prepare his pre-sentence

MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (April 7, 2020) at www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

defense"); *United States v. Mclean,* No. 19-cr-380 (D.D.C. Mar. 28, 2020) ("[T]he facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception– COVID-19– however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels*, 8:16-cr-76-JVS, ECF 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the COVID-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) ("[T]he Court is . . . convinced that incarcerating the defendant [with history of gun and drug crimes] while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) (same); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender, stating "it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *see also*

*United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the COVID-19 pandemic"); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the [facility]"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant, in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) (granting temporary restraining order and releasing high-risk plaintiffs because "[t]he nature of detention facilities makes exposure and spread of the [coronavirus] particularly harmful"); *Coronel v. Decker*, 20-cv-2472-AJN, ECF 26 (Mar. 27, 2020) (granting temporary restraining order and releasing defendant from immigration detention facility in light of COVID-19).

### B. Willie filed for administrative relief and more than 30 days have passed allowing the Court to grant him relief.

Willie submitted his request for a reduction in sentence to the Warden on April 22, 2020 and received a denial on April 30.[25] More than 30 days have now passed since he submitted his request. Pursuant to 18 U.S.C. § 3582(c)(1)(A), a defendant ordinarily must exhaust administrative remedies with the BOP or wait 30 days after submitting a request for compassionate release to the

---

[25] *See* Exhibit C.

warden, whichever comes first. 18 U.S.C. § 3582(c)(1)(A). It appears Willie has satisfied the prerequisite time period of waiting at least 30 days since he submitted his request, consequently the Court has the authority to grant his request now.

### C. The Relevant § 3553(a) Sentencing Factors Warrant Reducing Willie's Sentence to Time Served.

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. §3553(a) to determine whether a sentencing reduction or modification is warranted and whether the defendant's release would be a danger to the community. 18 U.S.C. § 3582(c)(1)(A)(i). Section 3553(a)'s primary directive is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."[26] Section 3553(a), paragraph 2 states that such purposes are:

1. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
2. To afford adequate deterrence to criminal conduct;
3. To protect the public from further crimes of the defendant; and
4. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Ibid*. In a compassionate release case, which is not a re-sentencing of the defendant, or a re-evaluation of the defendant's original sentence, the inquiry is whether these factors outweigh the "extraordinary and compelling reasons" warranting compassionate release, and whether compassionate release would undermine the goals of the original sentence.[27]

---

[26] *Id*.
[27] *United States v. Ebbers*, 2020 WL 91399, at *7 (Jan. 8, 2020).

Here, the time that Willie has already served, in addition to the period of supervised release that is to follow, plus his rehabilitative efforts during his period of incarceration satisfy the sentencing factors set forth in 18 U.S.C. § 3553(a). Therefore, compassionate release in this case would not undermine the goals of the original sentence. Moreover, Willie's compromised physical health, and unique danger he faces of contracting COVID-19 and becoming severely ill, when combined with the Section 3553(a) sentencing factors, warrant relief.

1.  The time Willie has already served reflects the seriousness of offense, promotes respect for the law, and provides just punishment for the offense.

In this case, a reduction of Willie's sentence would not diminish the seriousness of the offense that was committed. Willie has already spent over three years in prison because of the offense he committed. This period of incarceration, on the basis of the offense that Willie committed, furthers the notion that this Court does not take offenses of this nature lightly and that all offenders will be held accountable for their actions. Further, the time that Mr. Ferrell has already served, in addition to the subsequent five-year period of supervised release, will mean that Willie will have spent nearly a decade being held accountable for the offense he committed. Thus, the total time that Mr. Ferrell will have served will properly reflect the seriousness of the offense that was committed.

2.  The time already served provides adequate deterrence to criminal conduct and protects the public from further crimes of the defendant.

Should he be granted this release, although Willie would have only served a fraction of his 130-month sentence, the period of time served would still serve as a strong deterrent to any future criminal conduct from Willie. The offense that Willie committed has deprived him of the opportunity to spend time with his seventeen children. Prior to this period of incarceration, Mr.

Ferrell willfully provided care for all of his children without a court having to order him to do so.[28] During his childhood, Willie's parents were not present in his life. His mother, Geneva, spent her life abusing drugs and alcohol, and his father, Willie Sr., was in and out of prison throughout most of his childhood.[29] Willie's childhood was one that none of us would wish for our children—his sister was raped by their father and Willie himself was sexually abused by his uncle at the young age of 7.[30] It is clear that Willie didn't have a great childhood and his history of support clearly display his intent to provide a better life for his children.

Further, while it is true that Willie has committed several offenses in his past, he is now a man in his mid-40's with significant health issues that undoubtedly impair his ability to live the life he once did. The time that Willie has spent in prison has allowed him to grow and has provided him the opportunity to re-organize his priorities. Should he be released, Willie would have the opportunity to re-establish himself as a contributing member to the Indianapolis community, where he would maintain lawful employment and be able to make up for the lost time with his children.

Willie understands that this period of incarceration has cost him dearly. Further, he also understands that his life is in significant danger while he is currently in prison because of the deadly pandemic that is currently ravaging our planet, the Bureau of Prisons and FCI Milan included. Therefore, in this case, compassionate release would not only allow Willie to substantially correct the wrong path that his life was previously on, it would also quite literally provide him an opportunity to stay alive. After all, his death would clearly bring a tragic end to his arduous journey of self-improvement. Thus, given the circumstances, the time lost with his children, in addition to a second chance at living, serve as the most effective deterrents and help

---

[28] *See* Dkt. 172 at Objections No. 4 & 5, Para. 59, 62.
[29] *See* Dkt. 172, Presentence Investigation Report, at Para. 52, 55.
[30] Dkt. 172, Para. 56.

ensure that this community will not suffer any further crimes from Mr. Ferrell. He understands that should he commit any further offenses; he would certainly be held accountable and he'd once again find himself in substantial danger. This would be an opportunity that he could not squander. Finally, the Court has the authority to enter a time-served reduction in sentence order and then modify Willie's term of supervised release to include home confinement and a term of extended time on supervised release. *See U.S.A. v. Damon Powell*, 1:16-cr-00152-JMS-MJD (Dkt., # 57). This would adequately protect the public while protecting Willie as well.

    3.  <u>Alternatives to incarceration in the BOP exist which still allow for public protection.</u>

The Government will likely argue that someone with Willie's criminal past needs to remain locked up in the BOP to ensure public safety. But alternatives exist which alleviate this fear and also protect Willie from the virus. The Court can enter a time-served order but add home confinement as a term of all or part of Willie's term of supervised release by the United States Probation office. See *U.S.A. v. Damon Powell, 1:16-cr-00152-JMS-MJD, (Doc. #57)* (Where the Hon. Jane Magnus-Stinson, over the Government's objection, ordered a reduction of sentence to time-served, but added home confinement and a third-year of supervision to the terms of the defendant's supervised release). These additional provisions of supervised release would further ensure that Willie continues to serve his sentencing in some form of incarceration, respects the law, and will not be a danger to the community.

    4.  <u>Willie's time served has been used to provide him with vocational training in the most effective manner.</u>

Prior to this period of incarceration, Willie successfully completed a sex offender treatment program in September 2005 and a domestic violence program in August 2005 in relation to a prior

offense.[31] These programs seemed to be beneficial because Mr. Ferrell's criminal history fails to show any similar offenses after his completion of the aforementioned programs. Further, Willie was able to earn his GED while incarcerated in the late 1990's.[32] During this period of incarceration, Willie has continued to work toward his self-improvement by spending countless hours of vocational, educational and rehabilitative training. Willie has taken, and completed, several vocational training courses since May 2019. He has completed courses that range from finance, to science and health and fitness.[33] Mr. Ferrell has spent this stint of incarceration in a productive manner that will allow him to accomplish his goal of obtaining his degree from Fortis College so that he may soon begin to work in his desired area of employment.[34] At this point in time, Mr. Ferrell has finally acquired skills that will allow him to be the best version of himself. While his history shows that he has made many mistakes, Mr. Ferrell's dedication to self-improvement has put him in a better position to use those skills to maintain gainful employment as opposed to being lured back into the life of drug dealing.

The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19—compounded by the heightened risks faced by Willie, whose ability to engage in basic self-protective measures is restricted—warrant compassionate release. Willie's current anticipated release date is in April 2026. As mentioned above, the time he has served already is "sufficient, but not greater than necessary" to satisfy the goals of sentencing under 18 U.S.C. § 3553(a). Thus, Willie seeks an order reducing his sentence to time served.

---

[31] *See* Dkt. 172 at Para. 64.
[32] *Id.* at Para. 69.
[33] *See* Exhibit "D".
[34] *See* Exhibit "B".

## CONCLUSION

The novel coronavirus that causes COVID-19 has triggered a pandemic that will leave a long-lasting effect on this planet. This highly transmissible and extraordinarily dangerous virus has already effectively halted the entire planet to a standstill. This virus poses a severe threat of death to individuals with underlying illnesses. Given Willie's underlying coronary health issues, he is exceptionally vulnerable to fatality should he contract this deadly disease. Therefore, these circumstances have created "extraordinary and compelling" reasons to grant his motion for compassionate release. Thus, for the aforementioned reasons, Willie respectfully requests that the Court immediately reduce his sentence to time served.

Respectfully submitted,

BRATTAIN MINNIX GARCIA

/s/ Mario Garcia
Mario Garcia, #21638-49
One Indiana Square, Suite #2625
Indianapolis, Indiana 46204
(317) 231-1750
Attorney for the Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of June, 2020, a copy of the foregoing was filed electronically.  Notice of this filing will be made available by operation of the Court's CM/ECF system.

/s/ Mario Garcia
Mario Garcia